**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



Russ Kendig
United States Bankruptcy Judge

**Dated: 03:19 PM August 15, 2018**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| JEFFERY PAUL CLAIR, | ) | CASE NO. 17-62029 |
| | ) | |
| Debtor. | ) | ADV. NO. 18-6001 |
| _____ | ) | |
| MICHAEL CURTIS, | ) | JUDGE RUSS KENDIG |
| GLORIA CURTIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT FOR PUBLICATION)** |
| JEFFERY PAUL CLAIR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Now before the court is Defendant's motion for summary judgment brought pursuant to Bankruptcy Rule 7056. Plaintiffs oppose the motion.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district on July 16, 1984. This is a core proceeding

1

under 28 U.S.C. § 157(b)(2)(I) and the court has authority to issue final entries. Pursuant to 11 U.S.C. § 1409, venue in this court is proper.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

## FACTS

Jeffery Paul Clair ("Defendant") formed WEBX Internet Solutions, Inc. ("WEBX") on July 9, 2003, pursuant to the laws and rules of the State of Ohio. Defendant was likewise one of the founding members of ULS Ventures, Inc. ("ULS"), which was formed on August 31, 2011. Prior to any financial entanglement, Defendant provided marketing and website services to Plaintiff Michael Curtis. On March 1, 2012, Curtis provided the first of several checks to Defendant, in the amount of $50,000.[1] Curtis gave two additional checks to Defendant in that first month alone, each in the amount of $25,000, made to the order of ULS. These three initial checks were all deposited in a PNC Bank checking account belonging to ULS, between March 5, 2012 and March 19, 2012. Curtis and his wife, Gloria Curtis, allege that this is the only bank account belonging to ULS.

There is no written agreement included in the court record, but the parties agree that Defendant represented to Plaintiffs that he would use the funds for business purposes, and Defendant told Plaintiffs via email that the loans would be repaid after 5 years, with Plaintiffs becoming a 5% owner in ULS. Curtis made another large loan of $20,000 on December 11, 2012. From late 2013 through July of 2014, Curtis and his wife made five additional loans to Defendant.[2] Between the two of them, Plaintiffs loaned Defendant a total of approximately $136,500.

Plaintiffs allege that bank records will show there were three withdrawals from the ULS checking account during the month of March, totaling $99,500. According to the remaining bank statements, Plaintiffs claim, Defendant made no other large deposits to the sole ULS account before the business closed in 2013. If this information is correct, the final five loans made by Plaintiffs, totaling $16,500, could not have been used for ULS business purposes, as the business had already shuttered its doors. Plaintiffs also claim that the discovery shows no evidence that the other large check of $20,000 was ever deposited in an account belonging to either ULS or WEBX. Per Plaintiffs, Defendant's 2012 and 2013 federal tax returns for ULS will show no deposits or income for either year for ULS. Defendant points out that he was not in possession of bank statements for ULS from the period of September 2012 through December 2013, and despite suggesting that Plaintiffs themselves subpoena PNC Bank for the records,

---

1 As detailed in the subsequent facts, both of the Plaintiffs – Michael Curtis and Gloria Curtis – wrote checks separately to Defendant. Neither the adversary complaint nor the response to the Motion for Summary Judgment differentiates between the two individuals for purposes of stating their claims of nondischargeability.
2 November 2, 2013 - $1,000
   April 16, 2014 - $3,000
   March 24, 2014 - $3,000
   May 25, 2014 - $4,000
   July 10, 2014 - $5,500

claims they did not do so.

During discovery, Plaintiffs were also given federal tax returns for WEBX for years 2012 – 2015, and WEBX bank statements for January 2014 – December 2015.

On or about May 11, 2017, Plaintiffs filed a civil complaint against Defendant in the Stark County Court of Common Pleas, alleging that Defendant owed them $136,500. Defendant filed a petition for bankruptcy under Chapter 7 on September 12, 2017. Plaintiffs commenced this adversary complaint on January 2, 2018, seeking nondischargeability under 11 U.S.C. §§ 523(a)(4) and (6). The instant motion for summary judgment was filed on July 16, 2018.

## **DISCUSSION**

Federal civil procedure rules regarding summary judgment are incorporated into adversary proceedings. Fed. R .Bankr. 7056. In order to succeed on a motion for summary judgment, the movant must show that "there is no dispute as to any material fact," and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. 56. In considering the motion, the court must view the evidence in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). If the moving party meets her burden of showing the absence of genuine issues of fact, the burden shifts to the nonmoving party to establish the existence of a fact requiring trial. Automated Sol. Corp., v. Paragon Data Sys., Inc., 756 F.3d 504, 521 (6th Cir. 2014) (citation omitted). Such a material fact is one having the potential to affect the outcome of the proceeding. Rieser v. Hayslip (In re Canyon Sys. Corp.), 343 B.R. 615, 629 (Bankr. S.D. Ohio 2006). However, the nonmoving party "must present significant probative evidence in support of its claim" in order to defeat the motion for summary judgment. Moore v. Philip Morris Cos., 8 F.3d 335, 340 (6th Cir. 1993), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The nonmoving party cannot simply "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact." Anderson, supra, at 248.

A "debt" is statutorily defined as liability on a claim, which is in turn defined as a right to payment. 11 U.S.C. §§ 101(12), 101(5). Per the Supreme Court, a right to payment is "nothing more nor less than an enforceable obligation." Cohen v. De La Cruz, 523 U.S. 213, 219 (1998), quoting Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552, 559 (1990). The central question then is whether there exists a dispute as to any material fact that would help prove or disprove the dischargeability of the debts at issue.

Plaintiffs claimed in their adversary complaint that part of Defendant's debt is nondischargeable because it was incurred due to willful and malicious injury to another person or his property. Plaintiffs' complaint also alleged a violation of the prohibition against embezzlement and defalcation, but without any explanation. Defendant, in his motion for summary judgment, addressed the willful and malicious injury exception to discharge, as well as the allegation that the debt is nondischargeable because it arose from embezzlement.

3

## A. Dischargeability under 11 U.S.C. 523(a)(4)

Under the Bankruptcy Code, a debt will not be discharged, to the extent that it was obtained by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C § 523(a)(4). When either the embezzlement or larceny exception is claimed, "there is no requirement to prove that the debtor also acted in a fiduciary capacity." Westfield National Insurance Company v. Young (In re Young), 2018 Bankr. LEXIS 624 (Bankr. N.D. Ohio 2018), at *5. See, e.g., Peavey Electronics Corp. v. Sinchak (In re Sinchak), 109 B.R. 273, 276 (Bankr. N.D. Ohio 1990) ("It is clear that the element of 'fiduciary capacity' refers only to 'fraud or defalcation,' and it need not be present where embezzlement is the exception to discharge relied upon.").

The term "embezzlement," as used in 11 U.S.C. § 523(a)(4), is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73, quoting Gibble v. Carlton (In re Carlton), 26 B.R. 202, 205 (Bankr. M.D. Tenn 1982). Under this definition, a creditor may prove embezzlement by "showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." Brady, supra, at 1173.

A threshold inquiry when assessing an embezzlement claim, however, is *whose* property has been allegedly misappropriated. Though using received funds in ways outside of the agreed-upon scope may be unethical or illegal in a variety of other ways, it only becomes embezzlement when done with someone else's property. One simply cannot embezzle one's own property. Anzalone v. Dulgerian (In re Dulgerian), 388 B.R. 142, 151 (Bankr. E.D. Penn. 2008). In Dulgerian, the debtor defrauded his widowed mother-in-law, to the tune of $500,000, and yet the court ultimately found that she had failed to state an embezzlement claim. Id. This, the court explained, was because the money in question – spent on lavish purchases to which the creditor had certainly not agreed – was a loan, "and therefore belonged to [the debtor]." Id.

Plaintiffs may have had certain expectations regarding how their loan proceeds would be spent, though this court has not been made aware of any specific parameters. At the very least, they were made to understand that the money would be used for business purposes, and would be repaid with an ownership stake as interest. However, Plaintiffs' money ceased to be *theirs* when they gave it to Defendant. Regardless of his intentions in spending that money, it was in fact his money to spend. Embezzlement is not the proper theory through which to claim that Defendant mishandled the funds, and as such the court dismisses any claimed exception to nondischargeability based on 11 U.S.C. 523(a)(4).

## B. Dischargeability under 11 U.S.C. 523(a)(6)

Section 523(a)(6) provides an exception to dischargeability where the debt arises from the "willful and malicious injury by the debtor to another entity or to the property of another

4

entity." The Sixth Circuit explains that a willful injury is "deliberate or intentional," and a malicious one is imposed in "conscious disregard of one's duties or without just cause or excuse." Trost v. Trost, 2018 U.S. App. LEXIS 14225 (6th Cir. 2018), at *5, quoting Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986). The Supreme Court has clarified that in order for such an injury to be found nondischargeable, the debtor must "intend the consequences of an act, not simply the act itself." Id., quoting Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998). The Sixth Circuit has further fleshed out this requirement by explaining that such injury will only be found if the debtor either "desires to cause the consequences of [the] act", or "believes that the consequences are substantially certain to result from it." Id., quoting In re Markowitz, 190 F.3d 455, 464 (6th Cir. 1999) (citation, internal quotation marks, and brackets omitted). A plaintiff's claim that part of the debtor's debt owes to malicious or willful injury must be proven by the plaintiff herself. In re Klayminc, 37 B.R. 728, 730 (Bankr. S.D. Fla. 1984).

Plaintiffs offer no significant probative evidence establishing that Defendant intended to financially harm them, or even rebutting his claim that he would have fulfilled their agreement but for his financial insolvency. Plaintiffs refer repeatedly to Defendant's bank records as though they offer some proof of malicious intent; for instance, alleging that "[t]here is no evidence presented by Defendant . . . as to the whereabouts of said One Hundred Thousand Dollars . . . which were the initial opening deposits for the company at PNC Bank." Plaintiffs' Resp. p. 7. However, if the statements, where available, don't show what Defendant actually did with the money in question, they certainly can't show that he performed certain actions with the desire to cause injury to Plaintiffs. In that same vein, the court cannot draw inferences in either direction from the fact that some of the bank statements have not been made available. At best, they leave unanswered questions, and the insistence that the answers to those questions, if they were discovered, would support Plaintiffs' nebulous allegations is simply not concrete enough to carry the burden of proving a genuine issue of material fact. Plaintiffs don't even so much as offer a theory regarding the allegedly nefarious uses to which Defendant may have put their loans, no evidence of speedboats or vacations or five-course meals. They are grasping in the dark, and urging this court to act on the mere intuition that mismanaged finances and incomplete records point directly to malice.

Plaintiffs also refer to the fact that Defendant cashed several checks that they wrote to him after he closed ULS as probative of his intent to injure, but this again overstates the evidentiary value of the documents. Defendant admits that he closed ULS in 2013, after failing to turn a profit. This means that, for at least four of Plaintiffs' payments, the money could not possibly have been used for ULS business expenses.[3] In Plaintiffs' view, this as good as proves that Defendant lied about how the funds would be used, and demonstrates his intent to cause them harm. However, all four of the 2014 checks were made out to WEBX, and the November 2, 2013 check was made out to Jeff Clair; on the face of the documents, there is no indication whatsoever that the Plaintiffs believed this money was to be specifically used by ULS. Nor does Defendant's affidavit provide any evidence to the contrary, as he indicated that Plaintiffs made their loans "to [him] and to ULS Ventures LLC from a period of approximately March 2012-July 2014." Aff. Defendant p. 6 (emphasis added). Plaintiffs don't even allege in their response that they believed their loans were to be applied solely to ULS, only that they thought

---

3 See fn 1, supra.

they would be used "for business purposes."   There is quite a bit of daylight between lack of clarity and malicious injury.

Finally, Plaintiffs argue that the fact that the federal income tax returns for ULS do not reflect their loans likewise implies sinister intentions or fraudulent bookkeeping.   However, loans are not considered income, and as such would not be included within the income tax return data in any event.[4]   If loans should be on the tax returns for some other reason, the court is left to guess what that might be.   Plaintiffs give no reason why the transactions should be reflected on the corporate returns.

Though perhaps the lack of records showing how the money was spent after its withdrawal from the PNC account might support the inference that Defendant intended to use the money in ways he had not discussed with Plaintiffs, that is a far cry from proving an intent to inflict injury.   Likewise, there is nothing in the record to even hint obliquely at any malice in Defendant's conduct.

Plaintiffs would ask this court to make a long string of unsupported inferences in order to arrive at the conclusion that Defendant set out to intentionally damage Plaintiffs and their livelihood, and yet provide no concrete reasons to do so.   Though summary judgment is a blunt instrument, and should be used with care, it cannot be avoided simply by promising a convincing story at trial, and precious little else.   If Celotex[5] and its progeny mean anything, they certainly must mean this: to prove willful and malicious injury, one must put forth something more than that money was loaned and lost.   Given the lack of genuine dispute as to any material fact, the court dismisses Plaintiff's 11 U.S.C. 523(a)(6) claim.

The court will grant Defendant's motion for summary judgment by separate order.

\#          \#          \#

**Service List:**

**Michael Curtis**
**Gloria Curtis**
6990 Whipple Avenue N.W.
North Canton, OH 44720

**David A. Van Gaasbeek**
1303 W. Maple Street
#104

---

4  See, e.g., Sean Hearn, *Are personal loans considered income?*, Investopedia (Oct. 10, 2017), https://www.investopedia.com/ask/answers/120315/are-personal-loans-considered-income.asp; *Are Personal Loans Taxable?*, fivecentnickel (Apr. 5, 2018), https://www.fivecentnickel.com/are-personal-loans-taxable/.
5  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

18-06001-rk   Doc 25   FILED 08/15/18   ENTERED 08/15/18 15:46:21   Page 6 of 7

North Canton, OH 44720

**Jeffery Paul Clair**
7073 Bretz Avenue N.W.
Massillon, OH 44646

**Joseph A. Kacyon**
2745 Nesbitt Avenue
Akron, OH 44319

**Ryan R. McNeil**
333 South Main Street
Suite 401
Akron, OH 44308

18-06001-rk    Doc 25    FILED 08/15/18    ENTERED 08/15/18 15:46:21    Page 7 of 7